We have four cases this morning, and the first of them is In Re Affinity Labs of Texas, number 161092. Mr. Manske, is that correct? Good morning, your honors, and may it please the court. The subject patent in this case, the 833 patent, covers a specific method of delivering content between two devices, a portable media device, or portable device, and a different electronic device. Now the PTO's analysis in this case would suggest that the patent simply covers two devices and communication between those two devices, when in fact, the patent in this case, the 833 patent, requires specific functionality of the two devices respectively, and specific functionality in the way in which the devices communicate with one another and a user shares and accesses content between those two devices. Now, there are two overarching issues in this appeal. The first is the scope to which the pre-AIA estoppel provision, section 317B, applies to the re-examination, and the second is the extent to which the examiner and ultimately the board erred in their assessment of the 833 patent claims and in their application of the asserted invalidity grounds against those claims. Turning to the first issue, and what we ultimately think is the dispositive issue in this proceeding, and that's the application of section 317B. How can you think that that applies here when the statute specifically refers to a party and then talks about the estoppel applying to neither that party nor its privies? Why would it go beyond just the one-party Volkswagen? Well, I would answer that in two parts. First, Your Honor, I don't think there's a dispute that 317B applies, at least to some extent. I think the dispute is the scope, as you suggested. Now, on that question, I think the key fact here is that the PTO itself merged the proceedings. So it merged the three re-examinations sua sponte, and I refer the panel to... If it can sua sponte merge them, it could sua sponte separate them as well, right? That's correct, but when it merged the proceedings, what it did procedurally is effectively create one proceeding, and that had two effects. One, that happened before this final decision came down, so when it merged proceedings, it effectively expanded the scope of the one singular proceeding. Procedurally, what's important there is when it merged the proceedings, and this is in the merger order, the PTO, in fact, invited the other requesters to comment on patent owner responses and office actions, thus expanding the scope of the grounds that were ultimately at issue. So the ability of the other requesters then was expanded. They were able to comment on grounds that were not originally asserted in their re-exam requests. But how does that make the statute apply to that, when it just is limited to that party or its privies? I would say that it applies to Volkswagen, because effectively, Volkswagen is the party in the district court and in the re-exam, and Volkswagen's re-examination expanded effectively, because in addition to the grounds that it originally requested re-examination on, Volkswagen was then able to comment on additional grounds, the full scope of the grounds across the three re-examinations. Well, wouldn't it just apply to just the claims that were at issue in the district court case? I think you argue otherwise, but again, the statute clearly says any such patent claim, it doesn't talk about the patent. Well, and I think that's the core dispute here that the two parties have in terms of statutory interpretation. And I think the statute is pretty clear. There's two different sections of the statute. There's a section that deals with pending re-examinations, and then there's a section of the statute that deals with as of yet or follow on re-examinations. And the language that you just referred to, the any such patent claims language, is not in the last part of the statute. It's the last part of the statute that discusses what is concerned with parallel litigation, where you have a re-examination that's already ongoing. What that says is that a re-examination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the office. So that section of the statute doesn't have that prefatory any such patent claim language that's located earlier in the statute with respect to follow on re-examination. I'll assume for purposes of this question that one would need to read in a kind of implicit may not be maintained on the claim that was the subject, that's the predicate for this. Okay. What kind of policy, common sense explanation would there be for having a broader provision that says the whole thing goes if any claim? Make sense of that for me. Yeah, I'd like to answer that in a couple parts. I think I'd start by saying not just the language we've talked about this morning, your honors, but also the way the statute is set up, the fact that there is two different scenarios. And we started some of the congressional history and some of the legislative history in our briefing, and there it's pretty clear that the underlying intent with the statute was to curb or prevent patent owner harassment. And this court said as well in function media that the purpose of the statute is to prevent duplicative or harassing action. So the way we read the statute I think is consistent with that in that the congressional kind of intent behind it was a recognition that there's a greater chance when you have this parallel litigation for the type of patent owner abuse or kind of duplicative action that we think occurred in this case. Factually, that is not present or is not as much at risk when you have a potential follow-on re-examination. So I think ultimately those are the two, we hit on the two core issues. One is the threshold parties issue, and the second is the any such patent language issue. And I would submit that under just a plain reading of the statute, you cannot read in and should not read in any such patent claim language into that last part of the statute. And ultimately here, I think it's also important to note one last thing on this point, that there was overlap in the litigation and the re-examination. So if you look at what Volkswagen asserted, the counterclaim is asserted in its answer. And I will refer the panel to 16808, that's the key page of the answer. All of the references, all the key references that were eventually asserted across the scope of the re-examination were asserted first in the district court. So there is overlap, complete overlap with the core issues between the two. I believe the PTO argues that you needed to file some kind of request for reconsideration on the petition to terminate. Yeah, my understanding of the PTO's argument here is specific to their interpretation of their regulations. That even though we petitioned twice to dismiss the proceeding under the grounds under 317B, under the interpretation that we've argued this morning, that we needed to petition a third time because the result of the first two petitions was a quote-unquote dismissal. Now legally, the case here that's relevant is Bennett v. Speer, and that's case cited by both the parties. Both the parties agree that applies. And the question on this issue is one, whether legal rights were determined, and two, whether it was the culmination of the agency's decision-making process. And here, our argument is effectively it was. It's a statutory interpretation issue. We petitioned twice, and the PTO set out its view of 317B. You said that their position is that you needed to petition a third time. Wasn't it that they just thought that you should seek reconsideration to get a final decision? Well, I would argue that that's form over substance. I think that they were asking us to once again present our 317B argument when it was clear after two petitions what their position on that statute was. On the merits of this case, I think, again, that the key issue here is 317B. And on the merits, I think the theme, without going into detail on everything, unless the court has specific questions on any of the grounds, which I'm happy to answer. I think the overarching theme is, as I discussed in my intro, the claims require specific functionality. And as you review the various grounds, what you're going to see is that in each of the grounds, some of that functionality is missing. Ultimately, we think that that analysis, that level of what we would deem a superficial analysis, is insufficient to meet the PTO's burden and is certainly insufficient to find the patent invalid here. So with that, unless there's any questions, I'll yield the balance of my time. What would you identify as being the core functionality that represents an inventive contribution to the useful arts? Well, I think certainly it's the specificity of the invention. For instance, the claims require not only just two displays, which is an issue that has been argued in this case, but two displays that can share specific graphical interface items. A graphical interface item comprising a name. And that's an issue with the Dwyer reference. So the ability to share that specific graphical user interface item from one device to another in the year 2000, which is the priority date here, we believe is novel. And I know today it might seem like that's not, but in the year 2000, we submit it certainly was. And I'll yield the balance of my time. Thank you. Good morning. May it please the court. I think there's three issues in this case. The termination issue, the prior art rejections, and the board's consideration of the secondary considerations evidence. I'm going to focus on the termination issue because that's what the appellant focused on, unless you have any other questions. The first issue is the director's position that under MPEP 1002, there was no final agency action on the petition to terminate because it was only dismissed. And the MPEP says if you want to obtain a final agency action of a denial of a petition, you should request reconsideration. Affinity has done that in other cases. That paragraph from the MPEP wasn't cited in the petition decisions, right? No, it was not. And also in those petition decisions, there wasn't any indication that in order for the patent owner to be able to have a true final decision on its petition, that it would need to petition again after not getting the relief from the first petition. That's true. I guess what I'm wondering is when I see a rather full, complete, thorough analysis that does seem to represent the culmination of the agency's thinking on an issue, just merely following what another chapter of the MPEP says, without any warning to the petitioner that it needed to file yet another petition, why couldn't they have believed correctly that this was, in fact, on the merits of final decision? Well, I think they are aware of the rule because there have been other cases where Affinity has been a party, they filed a petition to terminate, they received a dismissal, and they subsequently moved for reconsideration. I guess what I'm saying is we review agency decisions all the time, and whenever there is an action by the agency where it believes the petitioner has a right to further administrative review, it includes that on the last page of its agency action. And here, we don't have anything like that. That's true. And I think that's a fair point. I think it would have been helpful if that was in the dismissal, if they said they could have petitioned for reconsideration, so it would have been escalated to a higher level at the PTO. Who would it have gone to if there was another petition? This already went to the Office of Patent and Legal Administration. Yeah, I don't remember exactly who it would go to. It would go to a higher level agency director of some sort. I can't remember exactly who it goes to. Commissioner Patents would be writing a decision on this? It would go to a higher level. I can't remember exactly who would review it, but it would go to a different person. It would be escalated. And the whole point of this is just so the arguments they're making here could have been vetted. There could have been a record made. The PTO could have responded to those arguments, and there would have been a full record. But I'm happy to address the denial of the petition on the merits. Can I just ask, what is the status of something written in the NPEP that's not embodied in a formally adopted regulation? Well, I think the PTO gets some deference for its regulations. This is not a regulation, is it? No, it's a rule. You're right, it's a rule. What do you mean a rule? It's in the NPEP. There's some words in the NPEP. Not adopted as a rule that you can find in the CFR? Correct. And probably not ever published in the Federal Register? I assume the NPEP changes are not generally published in the Federal Register? There is a regulation that speaks to the termination. It doesn't go into the detail of the four-factor test that the NPEP says. No, but I was focusing on, I think, what you were just discussing before you get to what you were about to do, namely, this business about they had to basically seek re-hearing. There's nothing in the regulations about seeking re-hearing. That's just something in the NPEP. But getting to the merits of the four-factor test, I think the PTO's test, it makes a lot of sense because, first of all, it only applies against the party, and it only applies when there's a final decision that can't be appealed, and it only applies, it's consistent with the statute, which applies on a claim-by-claim basis, and that's how district courts. Isn't the crucial language of the statute, which I think Mr. Manske was focusing on, the phrase that does not have, is not written in a claim-specific way? And an inter-parties re-exam requested by that party or privies on the basis of such issues may not thereafter be maintained by the office. That's exact. That's the key point. There's nothing claim-specific about that. If you take that language just on its face, it says if the predicate for what came before, namely some, I'm going to just as a shorthand use a final judgment on some claim in another court case that occurs, then any inter-parties re-exam in which that issue was raised, poof, goes away. Right. Including without limitation as to what else is in that inter-parties re-exam. Right, and I think if you just use those words on such issues, that's one interpretation, but I think when you read the statute as a whole and look at the purpose of the statute as a whole, which is to prevent harassment by a requester who receives a final decision of infallibility with respect to certain claims, and that's what the statute talks about, I think when you read it in the context of the entire statute, it's clear that it's applying on a claim-by-claim basis. What do you think it means when it says on the basis of such issues? Is that limited to just those claims, or is it the entire thing is gone if those claims are at issue? I think it's talking about on the basis of such issues pertaining to the claims that were subject to a final decision at the district court that could not be appealed. That's what the PTO believes it refers to. And that makes sense because it wouldn't make sense to treat re-exams filed before a final decision differently than re-exams filed after a final decision, and that's consistent with how district courts review the validity of particular claims, and it's consistent with the purpose of the statute, which is to prevent harassment to a patent owner from a requester that's received a final decision of invalidity with respect to particular claims. And it's also consistent with how district court litigation works. Even though there may have been an assertion that all the claims were invalid, or at one point in their complaint they asserted that one or more of the claims were infringed, through litigation you focus the issues, and here they were focused to just two claims, 28 and 35. And so the PTO terminated their Volkswagen re-exam just with respect to claims 28 and 35 and the claims that depend from those claims. And those claims were terminated with respect to the Volkswagen re-examination, and they were confirmed. So those are going to be patentable. So there's no harassment, even though Appellant made a point that the other requesters, in this case Apple, could have commented on those claims. Those claims have gone through and will become patentable. And I think Appellant's interpretation would lead to a strange result where an ex parte, the King ex parte appeal would be terminated, even though ex parte re-exams are not subject to termination under 317B or any other statutes. And they also would require that the Apple re-exam be terminated, even though Apple wasn't a party and there was no evidence of a final decision adverse to Apple. I'd be happy to answer more questions about this topic or turn to some of the prior art rejections or the secondary considerations evidence if you have any questions. Can you address the question of the, I guess particularly Dwyer, about the graphical interface item comprising a name? Yeah, I'd be happy to do that. So Dwyer shows, if you look at figure 8, this is at A18, 798. 793, maybe? 793. You said figure 8? Yeah, sorry. Right, so Dwyer, you're right. A18, 793. It shows in figure 8 an icon 220 that's in the display area 218 and it's under the heading of a name and then 222 points to the name. And Dwyer also points to, contrary to Affinity's assertion, that that icon is selectable. If you look at A18, 798, column 9, starting at line 5 through 9, it says it's to be understood that the specific file requested may be selected. For example, by designating the corresponding icon in the field 218 of figure 8. Now the only icon in figure 218, I'm sorry, figure 8, is the icon 220. So I think that's a clear teaching that the icon is selectable and that's how you select a file for uploading or downloading. And you're relying on the fact that it says the type is voice? The type is voice? And that's figure 8. It says the type of file is voice. That's right, figure 8, it says the type of file is voice. I see that in the middle of the page. Oh, right, right. It says voice. That's a voice file, yes. Exactly. Right. Yep. Did the board rely on that figure 8 passage, the 220 and 222, in discussing this particular element of the claim? Did they rely on the passage I just told you about? You told me about two passages. One was in figure 8 and one was something else. I'm asking about the figure 8. Yeah, so the board looked to figure 8, and then they relied on a couple other passages. Where, with respect to this particular claim element, did the board rely on figure 8? I'm looking at page A8 of the board decision. Page A8. Really, page 7 of the board decision. Okay. Here, what I see is that they cited to the right of appeal notice pages 7 to 8. Yep, that's right. Which is at 8, 10, 640 to 8, 10, 641. Then at 8, 10, 640, they show figure 8. They make a copy of figure 8. Yeah, and I think Affinity made a point when they were making their arguments about the wire, they actually referred to the passages relied upon, the examiner and the board don't expressly disclose selecting that icon. But if you look at the passage that I just read to you, I think that is a clear teaching that those icons are actually selectable. Do you know if that passage you read from column 9 is in the RAN at pages 7 through 8? Do you know that? The RAN through 7 through 8? Yeah. Which is joint appendix 10640. 10640. Is that what that document is? Okay. The table of contents of your volume lists that page as within a page range 10632 to 690 with the description right of appeal notice, and that's page 7 and 8, and that has that figure on it. Yeah, figure 8 is definitely there. And that's what on page 8 of the board's decision is implicitly being incorporated by the RAN 7. That's what the examiner points to. They have the figure in the RAN. All right, if there's no more questions, I'll take a seat. Thank you, Mr. McBride. And you have almost five minutes. So I'd just like to address a couple things first right off the bat. On the waiver issue, the alleged waiver issue, this court need not defer to the NBEP, even if it's inclined to do so. That's not legally binding on this court, and I'd refer the board to the ENSO decision cited at page 18 of our brief. Can you just, since you have little time, elaborate in some kind of concrete way your answer to the question I asked you earlier about what kind of sense it makes to say, even though one claim was disposed of in the litigation, the whole IPR, wrong IPR, parties re-exam, goes away. What's the harassment scenario that this kind of otherwise hard-to-understand sweeping position would be protecting against? Right, and I think that this is kind of consistent with our focus on the word issues, and I think that the statute is framed in a way to be commiserate with the issues, especially in a scenario where you have parallel litigation like you had in this case. So in that scenario, there's more of a likelihood for something like what happened here to happen. The board merges proceedings and expands the scope of a proceeding, and so effectively, Affinity Labs in this case had to deal with invalidity issues in district court, and it also had to deal with those exact same invalidity issues in the re-exam. And when the board, I'm sorry, when the PTO sua sponte merged the proceedings, it expanded the scope of that invalidity overall, the invalidity fight against the 833 patent, without any sort of commiserate, at least based upon the PTO's interpretation of 317B, without any sort of commiserate protection for the patent owner. So I think the nature of your question is why would the estoppel provision be narrower for a follow-on re-examination? And I think what Congress, in the intent of curbing patent owner harassment, what Congress realized is that the risk in that scenario of the sort of situation you have here, where you have harassment, is lower. Now, as a practical matter, most of the time when you have a litigation like that, the parties are going to settle out like they did here, after there was an infringement finding. So the scenarios under which there's going to be a follow-on re-examination are practically few and far between. So there's no need to have a broad and essentially flexible estoppel provision here the way we interpret it, if that answers your question, Your Honor. So I want to address one other issue on the waiver thing. PTO, Mr. McBride suggested that the issue was, you know, it could be fully vetted if we had petition again. But I would point the panel to the board's decision with respect to the petitions, and that's at 16897 of the appendix. And that's pretty fulsome with respect to their view of Section 317B. I'm sorry, what page were you at? It should be at 16897, beginning at 16897. This is the petition decision? Yeah. From OPLA? Correct. This isn't the board's decision. Sorry, I misspoke, Your Honor. It's the petition decision, and it sets out pretty expansively the PTO's view of 317B. And if I may, Your Honor, as just one last point, I'd like to quickly address the Dwyer issue because I think we may have got our wires crossed. The element that I was talking about when asked about the novelty of the patent was the ability to display a graphical interface item of an icon comprising a name, and that functionality on a portable device. What they're pointing to and what they're talking about is a different element, and it's the soft button element, and that is on a different electronic device. So what Figure 8 in Dwyer deals with is what's on the computer. But that's the limitation for Dwyer that you asserted was missing in the claim, right? That's one of the issues that we have asserted. I think the main issue with Dwyer, if I may, is what it's missing with respect to the portable device. In the portable device, and this is the second limitation of Claim 1, it requires the ability to display a graphical interface item on a display, and that graphical interface item must be an icon comprising a name. What the PTO is pointing to here are two things. One, Dwyer's general disclosure of a touchscreen, and two, Dwyer's disclosure, Figure 5 of Dwyer, which shows an example of header data that might be in the system. The key error here is that the PTO never connects these two ideas. And one of the grounds is an anticipation ground. So there's nothing in the record to conclude that what's shown might be a perspective identifying information in the system for a file is what's replicated on the portable device touchscreen. I think your time is up, but I think we're about to see you again. Thank you. Thank you. We will then proceed to In Ray Affinity Labs of Texas, number 161173.